[No. A025872. First Dist., Div. Four. Mar. 26, 1986.]

IRM CORPORATION, Cross-complainant and Appellant, v.
NELS CARLSON et al., Cross-defendants and Respondents.

**COUNSEL**

Kincaid, Gianunzio, Caudle & Hubert and Robert W. Brower for Cross-complainant and Appellant.

Carniato & Allen, John J. Carniato, McNamara, Houston, Dodge, McClure & Ney and J. Thomas Deal for Cross-defendants and Respondents.

**OPINION**

**SABRAW, J.**—In this matter we decide an issue which has already been considered with conflicting results by a number of the other Courts of Ap-

peal—does a good faith settlement between alleged joint tortfeasors and a plaintiff bar a cross-complaint by another alleged joint tortfeasor who seeks total equitable indemnity from the settling tortfeasors on a theory, inter alia, of active/passive negligence. We conclude that it does. We further conclude that claims for implied contractual indemnity are subject to the same rule. Finally, we address a related due process issue raised by cross-complainant IRM Corporation, find it is without merit, and affirm the judgment.

## I. STATEMENT OF FACTS

IRM appeals from a judgment of dismissal of its cross-complaint for indemnity against Western Shower Door, Inc., and Nels Carlson dba Merritt Construction Company (Merritt Construction). The facts which led to that dismissal are relatively simple.

### A. *The Genesis of IRM's Cross-complaint*

In 1974, IRM apparently assumed management of an apartment complex located in Moraga. In 1978, one of IRM's tenants, George Becker, sustained serious injuries when he struck the glass shower door in the bathroom of his apartment, breaking the glass and cutting his hand. The glass in the shower door was untempered; the building code in effect in 1962 required that glass shower doors installed at that time be made of tempered glass. The shower door was installed in 1962 by Western Shower Door, acting as a subcontractor during construction of the apartment complex. The component parts of the door were obtained from Pioneer Shower Door, Inc. Merritt Construction was the general contractor on the apartment construction project.

### B. *The Litigation*

After he was injured, Becker filed suit against his landlord IRM seeking personal injury damages based on theories of negligence and strict products liability. IRM, in turn, filed a cross-complaint against Merritt Construction and Western Shower Door. IRM alleged four different theories as the bases for its cross-claims: (1) total indemnity "by operation of law"; (2) total equitable indemnity arising out of the claim that the cross-defendants' alleged negligence was "active" while the alleged negligence of IRM, if any, was "passive"; (3) total indemnity based on cross-defendants' breach of express and implied warranties (contractual indemnity); and (4) comparative equitable contribution under the doctrine of comparative negligence. Thereafter, plaintiff Becker joined Merritt Construction, Western Shower Door and Pioneer Shower Door, Inc., as parties defendant.[1]

---

[1]The record contains no indication of how or when Pioneer Shower Door was added as a party, but it had become a party defendant by the time of the events which concern us. Pioneer is not a party to this appeal.

IRM was granted summary judgment against plaintiff Becker in 1981. Becker appealed the summary judgment.[2] The remaining litigation between the parties continued during Becker's appeal from the IRM summary judgment. In 1983, Western Shower Door and Merritt Construction, while denying any liability, entered into a sliding scale settlement agreement (a so-called Mary Carter agreement) with plaintiff Becker. In the agreement, Merritt Construction and Western Shower Door agreed to pay Becker $150,000 initially and an additional $50,000 if he recovered less than $200,000 against the remaining defendants IRM and Pioneer Shower Door. By the agreement, Merritt Construction and Western Shower Door hoped to limit their maximum liability to $200,000.

Code of Civil Procedure section 877.5[3] requires that a court in which litigation is pending be promptly notified by the parties of the existence and terms of any sliding scale settlement agreement. As required by section 877.5, Merritt Construction and Western Shower Door notified the trial court of the sliding scale settlement agreement through a motion in which they sought an order "approving sliding scale recovery agreement." In the notice of motion and supporting memorandum of points and authorities, the parties requested that the court find the settlement was entered into "in good

---

[2]Our Supreme Court in *Becker* v. *IRM Corporation* (1985) 38 Cal.3d 454 [213 Cal.Rptr. 213, 698 P.2d 116] expanded the existing law of landlord-tenant holding that IRM, as a supplier of rental housing, could be held strictly liable for placing a dangerous and defective product, the untempered glass shower door, and hence an unsafe apartment, in the marketplace. At the same time, the court noted that in cases where such liability is asserted, "[t]he landlord will also often be able to seek equitable indemnity for losses." (*Id.*, at p. 467.)

[3]Section 877.5 provides: "(a) Where an agreement or covenant is made which provides for a sliding scale recovery agreement between one or more, but not at all, alleged defendant tortfeasors and the plaintiff or plaintiffs:

"(1) The parties entering into any such agreement or covenant shall promptly inform the court in which the action is pending of the existence of the agreement or covenant and its terms and provisions; and

"(2) If the action is tried before a jury, and a defendant party to the agreement is a witness, the court shall, upon motion of a party, disclose to the jury the existence and content of the agreement or covenant, unless the court finds that such disclosure will create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

"The jury disclosure herein required shall be no more than necessary to be sure that the jury understands (1) the essential nature of the agreement, but not including the amount paid, or any contingency, and (2) the possibility that the agreement may bias the testimony of the alleged tortfeasor or tortfeasors who entered into the agreement.

"(b) As used in this section a 'sliding scale recovery agreement' means an agreement or covenant between a plaintiff or plaintiffs and one or more, but not all, alleged tortfeasor defendants, where the agreement limits the liability of the agreeing tortfeasor defendants to an amount which is dependent upon the amount of recovery which the plaintiff is able to recover from the nonagreeing defendant or defendants. This includes, but is not limited to, agreements within the scope of Section 877, and agreements in the form of a loan from the agreeing tortfeasor defendant to the plaintiff or plaintiffs which is repayable in whole or in part from the recovery against the nonagreeing tortfeasor defendant."

All statutory references are to the Code of Civil Procedure.

faith" but nowhere referenced the provisions of section 877[4] or section 877.6[5] which deal with the subject of "good faith" settlements, unlike section 877.5 which does not address "good faith." In this instance, the notice of motion and supporting papers referenced only section 877.5. However, paragraph 12 of the settlement agreement, attached to the moving papers, did reference both section 877.5 and section 877.6. Neither the notice of motion nor the supporting memorandum of points and authorities and declaration requested dismissal of IRM's cross-complaint.

A hearing on the motion was held on shortened notice of two days. No opposition to the motion was filed; all parties except Pioneer Shower Door were represented at the hearing. IRM's counsel informed the court that IRM had not filed papers concerning the motion because the motion papers had been received less than two days before. However, IRM's counsel expressed no significant opposition to the good faith nature of the settlement. During the hearing the subject of dismissing IRM's complaint was not discussed.

The court found the settlement was made in good faith and ordered IRM's cross-complaint dismissed with prejudice. IRM objected to the form of the order dismissing its cross-complaint. Conceding that its claim for *equitable contribution* based on comparative negligence was barred by the settlement, IRM asserted that its remaining three claims were not barred by section 877.6 because they were claims (1) for *total equitable indemnity* based on the distinction between the alleged active wrongdoing of cross-defendants and its own alleged passive liability, (2) for *contractual indemnity* and (3) for indemnity "by operation of law." IRM informed the court that it was willing to appear for a hearing regarding the disputed form of order if the court "deem[ed] it necessary," but did not specifically demand a hearing.

---

[4]Section 877 provides: "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort—[¶] (a) It shall not discharge any other such tortfeasor from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater; and [¶] (b) It shall discharge the tortfeasor to whom it is given from all liability for any contribution to any other tortfeasors."

[5]Section 877.6 provides in pertinent part: "(a) Any party to an action wherein it is alleged that two or more parties are joint tortfeasors shall be entitled to a hearing on the issue of the good faith of a settlement entered into by the plaintiff or other claimant and one or more alleged tortfeasors . . . . [¶] (c) A determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor from any further claims against the settling tortfeasor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault. [¶] (d) The party asserting the lack of good faith shall have the burden of proof on that issue."

██ Without any further hearing, the trial court entered an order dismissing IRM's cross-complaint. IRM appealed.[6]

## II. THE ISSUES FRAMED BY IRM

Having determined that the settlement before it was entered into in good faith, the trial court apparently accepted the arguments of the settling cross-defendants and reasoned that dismissal of IRM's cross-complaint was mandated by both section 877.6 and the analysis of the Supreme Court in *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899]. ██ ██ ██ On appeal, IRM contends that neither the Supreme Court's *AMA* decision nor section 877.6 bars its three remaining claims for total indemnity against Merritt Construction and Western Shower Door because its theories of recovery on those claims are founded (1) on the active/passive negligence distinction (tort) and (2) the asserted breach by cross-defendants of express and implied warranties (contractual indemnity).

██ As a second argument, IRM contends that it was denied due process because it was never given notice that its cross-complaint might be dismissed and never received the hearing referenced in section 877.6 on the question of whether or not the Mary Carter settlement agreement was entered into in good faith.

---

[6]The order dismissing the complaint was not fashioned as a judgment, but rather as an order of dismissal. An appeal from such an order is not specifically designated as an appealable order in section 904.1. Trial courts are not technically empowered by section 877.6 to dismiss cross-complaints such as that before us. They are simply empowered to determine if the settlement has been made in good faith which has the effect of barring the types of claims specified in section 877.6. Courts are only empowered to dismiss complaints and cross-complaints in the circumstances specifically provided by statute or case law such as those specified in section 581, subdivisions (c)-(g); *dismissal of a claim against a settling alleged joint feasor in the circumstance of a good faith settlement is not mentioned or authorized by sections 877, 877.5 or 877.6.*

Thus, if there is a court determination that a settlement has been entered in good faith and a cross-complainant such as IRM does not thereafter dismiss its cross-complaint, a motion for summary judgment or a motion for judgment on the pleadings is an appropriate means to enforce the bar to the action. (Cf., e.g., *Angelus Associates Corp.* v. *Neonex Leisure Products, Inc.* (1985) 167 Cal.App.3d 532, 534 [213 Cal.Rptr. 403]; *Torres* v. *Union Pacific R.R. Co.* (1984) 157 Cal.App.3d 499, 509 [203 Cal.Rptr. 825].) However, we do not believe that it is necessary for parties to appear on two separate occasions in order to obtain such a dismissal, the first to obtain a good faith settlement determination and the second on a motion for summary judgment or judgment on the pleadings. If properly noticed, we see no reason why the entire matter cannot be handled at one appearance.

We construe the order of dismissal in this case as a judgment on the pleadings for purposes of this appeal, as that appears to have been the intent of the trial court which took no evidence on the matter other than implicitly taking judicial notice of its own good faith settlement determination.

III. ANALYSIS

A. *The Good Faith Settlement Statute*

■ Section 877.6 was enacted by the Legislature in 1980 to establish a statutory procedure for determining if a settlement by an alleged joint tortfeasor has been entered into in good faith and to provide a bar to claims of other alleged joint tortfeasors for equitable contribution or partial or comparative indemnity when good faith is shown. According to our Supreme Court, section 877.6 is a codification of one of the principles adopted by it in *American Motorcycle Assn.* v. *Superior Court, supra,* 20 Cal.3d 578, 604, where the court concluded that "from a realistic perspective the legislative policy underlying . . . [section 877] dictates that a tortfeasor who has entered into a 'good faith' settlement [citation] with the plaintiff must also be discharged from any claim for partial or comparative indemnity that may be pressed by a concurrent tortfeasor." (*Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488, 496, fn. 5 [213 Cal.Rptr. 256, 698 P.2d 159]; see also *Turcon Construction, Inc.* v. *Norton-Villiers, Ltd.* (1983) 139 Cal.App.3d 280, 283 [188 Cal.Rptr. 580].)

B. *Previous Court of Appeal Decisions*

In its 1978 *AMA* decision, our Supreme Court determined that the principles of comparative negligence adopted in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393] should be used to apportion liability among multiple negligent tortfeasors under a comparative indemnity doctrine. Prior to the *AMA* decision, the doctrine of equitable indemnification had permitted passively negligent joint tortfeasors to obtain indemnity from joint tortfeasors whose active negligence was the primary cause of a plaintiff's injury. (See, e.g., *Alisal Sanitary Dist.* v. *Kennedy* (1960) 180 Cal.App.2d 69, 74 [4 Cal.Rptr. 379]; *Gardner* v. *Murphy* (1975) 54 Cal.App.3d 164 [126 Cal.Rptr. 302].) As we noted at the outset, the implications of the principles set forth in the *AMA* decision as applied in the context of good faith settlements have already been considered by several of the Courts of Appeal with differing results. We, therefore, survey those decisions to assist us in reaching our own conclusion on the question.

1. *The First Post-AMA Consideration of the Issue*

The continuing viability of the active/passive negligence distinction after the Supreme Court's *AMA* decision was first considered by the Third District Court of Appeal in *City of Sacramento* v. *Gemsch Investment Co.* (1981) 115 Cal.App.3d 869 [171 Cal.Rptr. 764], which arose before section

877.6 became effective. In *Gemsch,* a pedestrian was injured when she slipped and fell on seeds which had dropped from city-owned palm trees onto a sidewalk that had not been cleaned for five years and over which the city held an easement. After suing the city (an adjacent landowner) and a lessee and a sublessee of the property where the accident occurred, the pedestrian settled with all parties except the city. The settling defendants then successfully moved for summary judgment on the city's cross-complaint against them for indemnity on the ground that they had been alleged to be joint tortfeasors and had settled in good faith. The City of Sacramento argued that *AMA* did not eliminate the doctrine of total implied indemnity based on the active/passive negligence distinction as applied in cases such as *Gardner* v. *Murphy, supra,* 54 Cal.App.3d 164. The trial court and a majority of the Court of Appeal disagreed. Although it acknowledged that the Supreme Court had not expressly repudiated the concept of total equitable indemnity "where the alleged indemnitor's negligence versus the indemnitee's fault was passive/active, negative/positive, or secondary/primary," the *Gemsch* majority concluded that the Supreme Court had "left little doubt where it stood," citing the high court's analysis in *AMA* at pages 594-597. (*Id.,* at p. 876.)

In reaching its decision, the *Gemsch* majority next looked to the later decision in *Safeway Stores, Inc.* v. *Nest-Kart* (1978) 21 Cal.3d 322 [146 Cal.Rptr. 550, 579 P.2d 441] where the Supreme Court held that "equitable indemnity as modified by the partial indemnity doctrine permits apportionment on a comparative fault basis between a *strictly* liable defendant and a *negligent* defendant." (*City of Sacramento* v. *Gemsch, supra,* 115 Cal.App.3d 869, 876, italics in original.) In the view of the *Gemsch* majority, continuing validity of the passive/active distinction would have allowed full indemnity to a passive defendant who is strictly liable. However, in *Safeway,* the Supreme Court held otherwise, applying a comparative analysis to such a situation. Observing that the Supreme Court might not have completely abolished implied equitable indemnity in the traditional sense, the Court of Appeal majority concluded that in *AMA* the high court "severely modified one application of it, namely, the passive/active, primary/secondary approach." (*Id.,* at p. 877.) The majority went on to say that "[t]he instant case shows why it should be absorbed into the new comparative indemnity of *AMA.* The City had a separate but concurrent duty to trim or remove trees and to prevent a dangerous condition of which it had notice. There is no evident equity in favor of the City to allow full indemnity." (*Ibid.*) The *Gemsch* majority noted that the case before it was "a prime example of the dilemma facing counsel for alleged indemnitors. With the impetus of Code of Civil Procedure section 877 as broadened by *AMA,* when settlement is made without a recalcitrant codefendant, then settlors are faced with litigation to determine whether there is some trace of *Gard-*

*ner* left. Where the transaction rests upon related facts, either concurrent or successive, joint or several, which legally create a detriment compensable against multiple actors, the right of indemnity should follow *AMA* guidelines, unless a contract or statute otherwise provides." (*Id.*, at pp. 876-877.)

In a short dissent, Justice Paras took the position that nothing in *AMA* abrogated the equitable indemnity doctrine. He concluded that the Supreme Court could have stated that that was its intent if it had so desired in *AMA*, but it had not said so. In his view, "[t]otal equitable indemnity should not be foreclosed by the 'good faith' settlement of an active wrongdoer and the injured party, leaving the latter free to pursue his claim further against factually innocent, yet remedyless, persons." (*Id.*, at p. 879, dis. opn. of Paras, J.)

## 2. *The Gemsch Majority View Gains Momentum*

The continuing viability of the passive/active theory of implied indemnity was next considered by Division Two of the Second District in *Turcon Construction, Inc.* v. *Norton-Villiers, Ltd.*, *supra*, 139 Cal.App.2d 280. Citing *AMA* and the analysis of the *Gemsch* majority, the court unanimously rejected an attempt to rely upon the theory of active versus passive negligence in order to maintain a cross-complaint for indemnity after a good faith settlement by a joint tortfeasor had been made. (*Id.*, at p. 284.) Consistent with the *Gemsch* majority opinion, the *Turcon* court appeared to leave the door open to cross-complaints based on contractual indemnity or those where liability of a cross-complainant to the plaintiff is imposed solely as a matter of law because of the relationship with the settling tortfeasor. (*Ibid.*)

In *Kohn* v. *Superior Court* (1983) 142 Cal.App.3d 323 [191 Cal.Rptr. 78], Division Three of our district unanimously followed the analysis of the *Gemsch* majority. In that case, several cross-complaining defendants brought petitions for writs of mandate after their claims for total implied indemnity were dismissed by the trial court when two cross-defendants and alleged joint tortfeasors entered into good faith settlements with the plaintiff. The *Kohn* court was careful to explain that it was addressing only the issue of implied equitable indemnity based on *tort* theories because the petitioning parties had failed to properly present the issue of *contractual* indemnity to the trial court. (*Id.*, at p. 330.) The court noted that the petitioners had not asserted express contractual indemnity rights. It also noted that the court in *Kramer* v. *Cedu Foundation, Inc.* (1979) 93 Cal.App.3d 1, 12-13 [155 Cal.Rptr. 552], had already ruled that implied equitable indemnity had been

replaced by the *AMA* principles of implied equitable comparative indemnity. (*Ibid.*)

Finally, we have found one decision that has at least partially addressed the circumstance of a claim for indemnity based not on a contractual relationship or on an implied equitable indemnity but where the liability of the nonsettling joint tortfeasor exists solely by operation of law. *Lopez* v. *Blecher* (1983) 143 Cal.App.3d 736 [192 Cal.Rptr. 190] arose out of a vehicular accident. Blecher was traveling on a freeway when he came upon an overturned van. Blecher's vehicle struck the van and then struck a motorist who had stopped to give aid at the accident scene. The Good Samaritan sued Blecher, the driver of the van and both of the registered co-owners of the van, one of whom was Lopez. The plaintiff later settled with Blecher for $200,000. Blecher, in turn, successfully sought summary judgment against the cross-complaint of Lopez, asserting the settlement was made in good faith which discharged him from all further liability for total, partial or comparative indemnity or contribution. On appeal, Lopez argued that she was not a joint tortfeasor because her liability was limited and vicarious in nature as a registered co-owner of the van and thus only secondary while that of Blecher was "primary." The Court of Appeal rejected the argument, relying on *AMA* and the *Gemsch* majority opinion. It should be noted that the *Lopez* decision references discharge from all forms of implied indemnity, total, partial or comparative, although much of the reasoning is limited to partial or comparative indemnity.

### 3. *The Minority View*

In *Huizar* v. *Abex Corp.* (1984) 156 Cal.App.3d 534 [203 Cal.Rptr. 47], Division Five of the Second District reached a conclusion contrary to that of the *Gemsch, Turcon, Kohn* and *Lopez* decisions but consistent with the dissent of Justice Paras in *Gemsch* and the position now asserted by IRM. Huizar was an injured worker who sued the manufacturer and the distributor of a defective punch press. The two defendants cross-complained against each other. Among other things, the distributor sought total implied indemnity from the manufacturer on the basis of alleged implied and express warranties and on the theory that any negligence on its part was passive as contrasted with the alleged active negligence of the manufacturer. When the plaintiff entered a good faith settlement with manufacturer Abex, the trial court dismissed the cross-complaint of distributor Advanced. Advanced later settled with the plaintiff in good faith and the trial court then dismissed the cross-complaint of Abex against Advanced. Both Abex and Advanced appealed from the dismissals of their respective cross-complaints. The Court of Appeal reversed the dismissal of the distributor's cross-complaint against the manufacturer Abex, explaining:

"With reference to the suggestion by Abex that a cause of action seeking total indemnification is barred by a determination of good faith settlement under Code of Civil Code Procedure section 877.6, subdivision (c), *supra,* we are of the opinion that had the Legislature intended such a result, the appropriate language easily could have been incorporated in the subject statute. . . . [¶] As to the remaining contention of Abex, we opine that had the Supreme Court in *American Motorcycle Assn. v. Superior Court, supra,* 20 Cal.3d 578 intended or desired to abolish the doctrine of equitable or total indemnification, it easily could have so stated." (*Id.,* at p. 541.)

Somewhat surprisingly, the *Huizar* court did not cite or discuss the *Gemsch, Turcon, Kohn* or *Lopez* decisions. Like the *Gemsch* majority which reached the opposite conclusion, the *Huizar* court also looked to the Supreme Court's decision in *Safeway Stores, Inc.* v. *Nest-Cart, supra,* 21 Cal.3d 322, 332, footnote 5, to support its conclusion. It next referenced *E.L. White, Inc.* v. *City of Huntington Beach* (1982) 138 Cal.App.3d 366 [187 Cal.Rptr. 879], in which Division Two of the Fourth District held that a vicariously liable tortfeasor may still obtain full equitable indemnity from the party actually causing the harm to the injured party, stating: "To conclude otherwise would counter basic 'principles of common-law indemnification between vicariously liable tortfeasors and tortfeasors guilty of the acts and omissions causing the harm. In short, the apportionment rule applies to those who in fact share responsibility for causing the accident or harm, and does not extend further to those who are only vicariously liable. . . .' [Citation.]" (*Id.,* at p. 376.) In *Huizar,* the court's ruling was based on two different theories: (1) the doctrine of *total implied equitable indemnity*; and (2) a claim for *contractual indemnity* based on breach of express and implied warranties, an issue which the *Gemsch, Turcon* and *Kohn* courts never reached on the merits.

More recently, Division Three of the Fourth District in *Angelus Associates Corp.* v. *Neonex Leisure Products, Inc., supra,* 167 Cal.App.3d 532 considered the same issue now before us. After reviewing all of the decisions we have considered, the court followed *Huizar* v. *Abex Corp., supra,* 156 Cal.App.3d 534 and held that a nonsettling defendant in a products liability action may pursue a cross-complaint for total equitable indemnity against a codefendant manufacturer despite the latter's good faith settlement with the plaintiff.

C. *We Follow the Majority View*

1. *IRM's Second Cause of Action for Total Implied Equitable Indemnification*

We are persuaded that the analysis of the implied equitable indemnity issue by the *Gemsch* majority is consistent with the principle of comparative

negligence adopted in *Li* v. *Yellow Cab Co.*, *supra,* 13 Cal.3d 804 and with the concept of comparative indemnity referenced in *AMA* and section 877.6. We conclude that the policy considerations involved in those two decisions require abandonment of the concept of total implied equitable indemnity and its accompanying passive/active analysis. We hold, therefore, that the trial court properly dismissed IRM's cause of action for total implied equitable indemnity.

*2. IRM's Third Cause of Action Alleging Contractual Indemnity Based on Breach of Express and Implied Warranties*

In its third cause of action, IRM sought contractual indemnity based on the theory that Merritt Construction and Western Shower Door breached implied and express warranties they gave in building the apartment complex and installing the defective shower door. We observe preliminarily that IRM's theory involves at least a two-step analysis. First, IRM asserts that express and implied warranties of fitness for a particular use and of conformance with the applicable building code ran in its favor. Based on that assertion, IRM then jumps to the conclusion that breach of those warranties constituted grounds for invoking express and implied contractual indemnity. In so doing, IRM misconstrues the law of express and implied contractual indemnity.

Express contractual indemnity involves the agreement between two parties that one will indemnify the other in certain circumstances specified in the contract of indemnity. (See *E. L. White, Inc.* v. *City of Huntington Beach* (1978) 21 Cal.3d 497, 506-510 [146 Cal.Rptr. 614, 579 P.2d 505].) In the present case, IRM's express contractual indemnity theory fails for two reasons. First, there was no express contract of any kind between IRM and codefendants Merritt Construction and Western Shower Door. Second, even assuming that there had been an express contract of warranty between the parties, there was no express agreement between them on the subject of indemnity. At most, IRM can argue that an agreement to indemnify should be implied in these circumstances.

The manner in which we deal with the issue of implied contractual indemnity has been predetermined by the way we decided the equitable indemnity issue as explained by the court in *Kramer* v. *Cedu Foundation, Inc., supra,* 93 Cal.App.3d 1. *Kramer* did not involve the good faith settlement issues before us. However, it was decided after *AMA* and involved the question of whether the doctrine of implied contractual indemnity was still viable after *AMA.* The *Kramer* court considered the impact of *AMA* and explained that: "[i]mplied contractual indemnity is a form of equitable indemnity; it implies a contractual obligation to indemnify despite the absence of an express in-

demnity agreement where equitable considerations make it just to shift the loss to the other party. . . . In *E. L. White, Inc.* v. *City of Huntington Beach, supra,* 21 Cal.3d 497, 506-510, the court pointed out that parties were still free to formulate express contracts under which a 'passive' or even an 'actively negligent' party would be completely indemnified. However, the court reaffirmed that in the absence of express contract, the *American Motorcycle* principles of implied equitable indemnity requiring apportionment according to comparative fault must be applied." (*Id.,* at pp. 12-13.)

Thus, in *Kramer* we find additional support for our primary conclusion that the doctrine of implied equitable indemnification was abrogated by the *AMA* decision. It also instructs that the doctrine of implied contractual indemnity went the same route as did implied equitable indemnity. Applying *Kramer* to the present case leads to the inescapable conclusion that IRM's cause of action seeking indemnity based on a theory of implied contractual indemnity was properly dismissed.

### 3. *IRM's First Cause of Action for Indemnity "By Operation of Law"*

■ IRM's first cause of action is asserted to be based, in part, on a "line of California cases which have determined the right to indemnity between successive tortfeasors." The "line of California cases" referenced by IRM consists of two decisions, *Herrero* v. *Atkinson* (1964) 227 Cal.App.2d 69 [38 Cal.Rptr. 490, 8 A.L.R.3d 629] and *Niles* v. *City of San Rafael* (1974) 42 Cal.App.3d 230 [116 Cal.Rptr. 733]. Based on those two cases, IRM argues that when "(a) a plaintiff's injury is caused by two negligent acts, (b) the first tortfeasor has no control over the second tortfeasor's conduct and (c) the first tortfeasor's liability arises out of a rule of positive law, the first tortfeasor is entitled to *total* indemnity from the second."

We find IRM's reading of these two cases unpersuasive. We believe that cross-defendants accurately explain these decisions as attempts *to* apply the concept of comparative equitable indemnity to particular fact situations before *AMA* was decided, although the cases do not use such precise terminology. Furthermore, unlike the situation in *Herrero* and *Niles,* the negligent act of the party seeking total indemnity must be separate and distinct from the negligent act or omission of the second party. For instance, in the first cited case Herrero's negligence resulted in injury to Alice Lorenzo. When Lorenzo underwent surgery for that injury many months later, she died due to the alleged negligence of the medical professionals. The alleged negligence of the medical professionals was separate and distinct from that of Herrero in causing the original accident. By contrast, in the present case, the injuries to plaintiff Becker were allegedly caused by the joint failures of

IRM, Merritt Construction and Western Shower Door to see that the shower door was made of tempered glass. Thus, the alleged acts or omissions of IRM in this case are not separate and distinct from those of cross-defendants in the same sense as those in *Herrero*.

■ IRM also asserts that it is entitled to total equitable indemnity by operation of law based on its analysis of section 1021.6 which provides for an award of attorney's fees in certain actions for indemnity.[7] In IRM's view, this statute is further support that its claim for total equitable indemnity by operation of law should survive the good faith settlement by the other alleged joint tortfeasors. It reasons that barring its cross-claim for indemnity by operation of law would be unjust because in the event it is held liable to plaintiff Becker on his strict liability claim it would be in the position of a retailer of goods and would be entitled to reimbursement through indemnity from those higher up in the chain of distribution.

Although we agree that IRM might theoretically be entitled to indemnity for its attorney's fees from those higher up in the chain of distribution pursuant to section 1021.6 in the event that plaintiff Becker prevails against IRM on his strict liability theory, that circumstance does not automatically lead to the conclusion that it would be unjust to bar IRM's cross-complaints for indemnity "by operation of law." If one were to follow that logic, then it is unjust to bar cross-complaints for partial equitable indemnity or comparative indemnity in light of good faith settlements as section 877.6 now authorizes. The fact that IRM loses its ability to seek attorney's fees from other alleged joint tortfeasors pursuant to section 1021.6 is simply one additional factor to be considered in the overall analysis. Weighing all relevant factors, we conclude that IRM's theory of indemnity "by operation of law" must suffer the same fate as its claim for total implied equitable indemnity. The trial court properly dismissed this cause of action in light of the good faith settlement.

### 4. *General Considerations*

In view of the salutory purpose of encouraging settlements on which section 877.6 is based and the current backlog in the trial courts which settlements can help to eliminate, we have concluded that the good faith settle-

---

[7]Section 1021.6 provides in relevant part: "Upon motion, a court after reviewing the evidence in the principal case may award attorney's fees to a person who prevails on a claim for implied indemnity if the court finds (a) that the indemnitee through the tort of the indemnitor has been required to act in the protection of the indemnitee's interest by . . . defending an action by a third person and (b) if that indemnitor was properly notified of the demand to . . . provide the defense and did not avail itself of the opportunity to do so, and (c) that the trier of fact determined that the indemnitee was without fault in the principal case which is the basis for the action in indemnity. . . ."

ment between plaintiff Becker and cross-defendants Merritt Construction and Western Shower Door served to bar the cross-complaint of IRM. The sliding scale settlement in this case was conditioned on the settling cross-defendants receiving freedom from further exposure to liability above that specified in the settlement agreement. Settlements such as this in multiple party litigation are becoming more and more common. While some commentators and even some courts still express reservations about the wisdom and equity of permitting sliding scale settlement agreements, the Legislature expressly indicated its approval of such settlement procedures when it enacted section 877.5.

## IV. THE DUE PROCESS ISSUE

IRM contends that it was denied due process because it was never permitted a hearing on the good faith settlement issue. As we have explained Western Shower Door and Merritt Construction failed to give notice in their motion that they intended to request the court (1) to first make a good faith settlement determination pursuant to section 877.6 *and* (2) to then order IRM's cross-complaint dismissed.[8] Instead, the notice of motion and supporting papers referenced only section 877.5. It was not until after the hearing when the proposed form of order was prepared that IRM was notified of cross-defendants' intentions to obtain dismissal of IRM's cross-complaint.

Were the foregoing circumstances the only ones before us, the argument would be more persuasive and we might well conclude that there had been a denial of due process which would require remand for a properly noticed hearing. However, in this instance, IRM has *conceded* in its opening brief that the settlement was entered into in good faith. That being the situation there would have been absolutely no purpose served in this case by the court holding a hearing pursuant to section 877.6.[9]

---

[8]This omission may be attributable to respondents' erroneous contention on appeal that section 877.6 is inapplicable to "Mary Carter" settlements. Section 877.5 contains no bar to claims by nonsettling parties or joint tortfeasors; section 877.5 is, in effect, a rule of evidence which provides an exception to the general rule that offers to compromise and settlements are generally inadmissible evidence. (Evid. Code, §§ 1152, 1154.) In order to obtain a bar to a claim by a nonsettling party, in such cases, including those involving "Mary Carter" agreements, someone must first obtain a good faith determination from the court pursuant to section 877.6.

[9]Notwithstanding previous concessions in the trial court and before us that the settlements were entered into in good faith when tested against section 877.6, after the recent decision of the Supreme Court in *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates, supra,* 38 Cal.3d 488, IRM suggested that it would be appropriate for us to remand in order to permit the trial court to hold a good faith settlement hearing in light of the *Tech-Bilt* holding. In that case, the Supreme Court held that for purposes of determining good faith pursuant to section 877.6, a court must not limit its analysis to the issue of whether a settling alleged joint

In reality, what concerns IRM is not the opportunity to contest the good faith determination. Instead, IRM is really objecting to the lack of an opportunity to contest the dismissal of cross-complaint because it was never given notice that dismissal was being requested. In other words, IRM was never given proper notice that cross-defendants were, in effect, moving for judgment on the pleadings based on the expected good faith settlement determination.

In theory, IRM is undoubtedly correct. However, the suggestion by IRM in its papers challenging the form of the proposed order that it would appear at a hearing to have the issue of dismissal heard by the trial court, "if the court deem[ed] it necessary," can arguably be construed as a waiver of any objection to lack of notice and lack of a hearing on that issue. Obviously the trial court did not deem a hearing necessary; it apparently concluded that it was important to enter its order so that plaintiff Becker could receive some measure of immediate compensation for his injuries. In any event, on the particular facts of this issue, we find no error.

The judgment is affirmed. Each party shall bear its own costs on appeal.

Anderson, P. J., concurred.

---

tortfeasor has engaged in tortious conduct toward nonsettling parties. Instead, the court indicated that a wide variety of factors must be considered, including the amount paid in settlement. (*Id.,* at pp. 499-500.) Although the *Tech-Bilt* decision will undoubtedly affect future good faith settlement determinations in other cases, we find it of little help to IRM. Here, IRM chose not to challenge the good faith nature of this settlement in the trial court. IRM's counsel made a passing reference to the well-known, 11-year-old decision in *River Garden Farms, Inc.* v. *Superior Court* (1972) 26 Cal.App.3d 986, 998 [103 Cal.Rptr. 498] [dictum to the effect that "a low settlement violates the good faith clause"] and the Ninth Circuit's more recent decision in *Owen* v. *United States* (9th Cir. 1983) 713 F.2d 1461, 1465 [predicting the California Supreme Court would adopt a good faith settlement rule involving assessment of relative liabilities] but never specifically asserted that the settlement failed to meet the good faith standard of section 877.6. IRM requested and apparently received the opportunity to review and to object to the form of the order later presented to the court but chose not to renew any arguable bad faith settlement objection. Finally, in its opening brief on appeal, IRM stated: "*IRM concedes that the sliding scale recovery agreement was made in good faith.*" (Italics added.) It is significant to note in this regard that our Supreme Court granted review in *Tech-Bilt* on November 10, 1983, which was 25 days before the trial court's hearing in this case and over 7 months before IRM explicitly waived any even arguable assertion that it wished to raise the good faith settlement issue on appeal. By contrast, the decisions upon which Tech-Bilt based its appeal and which the Supreme Court approved in its decision were available to IRM if it had really desired to challenge the good faith claim below and on appeal. Accordingly, IRM cannot now rely upon the fortuitous circumstance of the *Tech-Bilt* decision in attempting to litigate an issue it chose not to assert on appeal. In any event, remanding on this ground would be pointless. At a Bench and Bar settlement conference the participants valued this case in a range of $200,000-$250,000. Here the settlement amount was $200,000 without any contribution from Pioneer Shower Door or IRM. To send this case back to the trial court for a good faith review on whether a $200,000 Mary Carter settlement was somehow disparate from a settlement conference top end value of $250,000 would be an obvious idle act and a waste of valuable trial court time.

**POCHÉ, J.**—I respectfully dissent.

My disagreement is with footnote 9. (Majority opn., *ante*, pp. 112-113.) There and only there does the majority come to grips with IRM's major point made at oral argument: that IRM is entitled to remand so that it can contest the good faith of the settlement on the basis of standards recently announced by the California Supreme Court in *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488 [213 Cal.Rptr. 256, 698 P.2d 159]. The refusal of this court to allow such a hearing is not premised on any belief that *Tech-Bilt* does not apply to cases pending on appeal.[1] Instead, the majority finds that IRM has waived the point. In my view, the majority is reaching beyond any fair reading of the record in finding a waiver below, and in finding waiver on appeal it is being patently unfair. IRM should be allowed its day in court to test the settlement in light of *Tech-Bilt.* I would therefore reverse and remand for a new hearing under Code of Civil Procedure section 877.6.[2]

*Waiver in the Trial Court*

As the majority acknowledges, the matter came for hearing on shortened notice—two days—and upon moving papers citing the incorrect statutory provision. (See majority opn., *ante*, p. 102.) Not surprisingly then, IRM did not file written opposition to the motion.[3] In characterizing what transpired at that hearing the majority opinion tells us that counsel for IRM expressed "no significant opposition to the good faith nature of the settlement." (Majority opn., *ante*, p. 102.) I read the transcript of that hearing quite differently. The following excerpt is the key passage.

"[Counsel for IRM]: Last thing I would like to add is I was at the Bench/ Bar Settlement Conferences, or at least the most recent one in this case. And my recollection is that although these things can be left to anyone's judgment, we were in the two hundred thirty thousand dollar to two hundred fifty thousand dollar ballpark. [¶] My current understanding is that Pioneer Shower Door has ten thousand dollars on this case. And that my client has twenty-five thousand dollars on this case. So together with the one hundred fifty thousand dollars here and the twenty-five and the ten, it appears that's getting into the ballpark of the total value of the case. [¶] If it is, if that's true, and everyone can argue about that, then we face what's now come to

---

[1]Cases subsequent to *Tech-Bilt* have not hesitated to apply its new test of good-faith settlement within the meaning of Code of Civil Procedure section 877.6. (See, e.g., *Standard Pacific of San Diego* v. *A. A. Baxter Corp.* (1986) 176 Cal.App.3d 577, 585 [222 Cal.Rptr. 106]; *Sagadin* v. *Ripper* (1985) 175 Cal.App.3d 1141, 1176-1177 [221 Cal.Rptr. 675].)

[2]All further statutory references are to the Code of Civil Procedure.

[3]Frankly, I do not understand why plaintiff's request to shorten time was granted.

be known as the Owens problem. [¶] I would cite to the Court that not being able to prepare written papers on this, there is a substantial conflict in the law right now created by a Ninth Circuit case called *Owens vs. U.S.* That says when you get close to the full value of the case, other factors must come into play in determining the good or bad faith of a settlement. [¶] And I would say without really having the opportunity to examine the settlement contract and give the court the authority of *River Gardens Farms* and *Owens,* difficult for me to really address in particular the other points. [¶] THE COURT: Well, I think the current law, at least insofar as this State is concerned, almost fraud and collusion is required to indicate the settlement is not in good faith. At least that's my understanding of the current law. [¶] I haven't read your Circuit Court case. Not binding on this Court. Only advisory. [¶] Mr. Carniato, [counsel for Merritt Construction Company] do you wish to add anything on the record? [¶] MR. CARNIATO: No, your Honor. [¶] THE COURT: I was the Judge on the Bench/Bar panel that handled the settlement in this conference matter. It did not settle. But the panel thought the two hundred thousand dollars was a fair figure. And two hundred thirty thousand dollars was not unreasonable, either. But I would find at this point this is a good faith settlement and do approve the Mary Carter agreement.''

Nowhere in that passage, or in the entire transcript for that matter, do I find a concession by counsel for IRM that the settlement was in good faith. On the contrary, I find counsel attempting to muster the best argument he could under unfair time constraints. What is most important to me is that IRM's counsel managed to find and to cite to the trial court two cases, *River Garden Farms, Inc.* v. *Superior Court* (1972) 26 Cal.App.3d 986 [103 Cal.Rptr. 498], and *Owen* v. *United States* (9th Cir. 1983) 713 F.2d 1461, each of which went contrary to the then prevailing test of what was a good faith settlement (see, e.g., *Dompeling* v. *Superior Court* (1981) 117 Cal.App.3d 798 [173 Cal.Rptr. 38]) and each of which was subsequently relied upon by the California Supreme Court in setting forth its new test of good faith in *Tech-Bilt.* (*Id.,* 38 Cal.3d at pp. 496-497 [text and fn. 6].)[4] To call that a waiver is to trifle with the transcript.

Why else would counsel cite these cases if he were not trying to challenge the good faith of the Mary Carter settlement? As far as I am concerned, counsel did enough to entitle IRM to raise the matter on appeal.[5]

---

[4]Actually, *Tech-Bilt* relied upon the predecessor to *Owen,* another Ninth Circuit case, *Commercial U. Ins. Co.* v. *Ford Motor Co.* (9th Cir. 1981) 640 F.2d 210.

[5]In fact counsel for IRM did just what the majority says he did not do. (See majority opn., *ante,* p. 112, fn. 9.)

*Waiver on Appeal*

My colleagues also point out that in its opening brief, IRM conceded that the settlement was in good faith. (See majority opn., *ante,* p. 112.) What was the state of the law on point coming from the California Court of Appeal at that time? Listen again to the trial court judge: "THE COURT: Well, I think the current law, at least insofar as this State is concerned, almost fraud and collusion is required to indicate the settlement is not in good faith. At least that's my understanding of the current law. [¶] I haven't read your Circuit Court case. Not binding on this Court. Only advisory." That is a brilliantly accurate statement by a trial judge who was obviously on top of the law. Since on this record there is no evidence that either Western Shower Door or Nels Carlson dba Merritt Construction Company engaged in such conduct, IRM decided not to waste this court's time with such argument in its briefs.

Then—after briefing—the law changed abruptly: *Tech-Bilt* came down and changed entirely the rules of the game. Given this record it is unfair in the extreme to deny IRM a hearing under the new rules.

In effect what the majority opinion does is announce a new rule of standing which will have the effect of encouraging frivolous appeals while putting at a premium those counsel—who unlike most members of the Court of Appeal—were sufficiently clairvoyant to have anticipated *Tech-Bilt.*

For these reasons, I would remand for a new hearing under the new criteria that apply to section 877.6.